**HICKSON CORP., Plaintiff and Counterdefendant,**

v.

**NORFOLK SOUTHERN RAILWAY CO., Defendant and Counterclaimant.**

**No. 1:95–CV–266.**

United States District Court, E.D. Tennessee, at Chattanooga.

Sept. 19, 2002.

*ORDER*

COLLIER, District Judge.

On April 29, 2002, the Court issued rulings from the bench on two important evidentiary issues. In the first ruling, the Court allowed the Hickson Corporation ("Hickson") to introduce evidence of a felony conviction sustained by the Norfolk Southern Railway Company ("Norfolk Southern") to impeach evidence the railway company introduced tending to show its good character for environmental stewardship. In the second ruling, the Court allowed Hickson to introduce certain findings of the National Transportation Safety Board ("NTSB") related to the arsenic acid spill giving rise to this lawsuit for the limited purpose of rebutting the inference created by Norfolk Southern's introduction

of a letter written by Jim Hall, the Director of the NTSB, praising Norfolk Southern's clean-up efforts. On May 1, 2002, upon Norfolk Southern's renewed objection to the introduction of an excerpt from the NTSB findings, the Court reaffirmed its second ruling. This Order elucidates the rationale behind the Court's decisions.

## I. PROCEDURAL HISTORY

On March 15, 2002, prior to the beginning of the retrial of this matter, Hickson moved in limine to exclude any reports of the NTSB and any testimony based on those reports pursuant to 49 U.S.C. § 1903 (Court File Nos. 729–30).[1] Norfolk Southern responded, stating it had no intention of offering any NTSB reports (Court File No. 737).

On April 22, 2002, during its case in chief, Norfolk Southern offered the testimony of Joe Oliver, an engineer employed by Norfolk Southern's environmental operations group. Mr. Oliver testified:

> Norfolk Southern—and I'm proud to say this—we have won the gold medal for safety for 12 consecutive years. Our railway is the safest railway industry in the nation.
>
> .    .    .    .    ..
>
> [The award is] called the E.H. Harriman award. The Harriman award is presented to the different classes of railroads. And there's basically three classes. You've got your big Class 1 carriers, you've got your small senior medium-sized railroads, and then you've got your short lines. For Class 1 railroads we have won the gold medal for 12 consecutive years. And that, to me, says everything about your safety program.

Prior to us getting on this run of winning this award so many years in a row, I think the most that anybody had ever won it was maybe two or three times in a row. So we're on a roll. And we're very, very proud of our safety record. We have set a new benchmark in the industry, and we're very proud of it. It's been difficult to achieve, but we have worked to make sure our employees are safe.

(Exh. A, Uncertified Realtime Transcript, Apr. 22, 2002, at 70–71).

On April 25, 2002, during its case in chief, Norfolk Southern offered, via deposition, the testimony of Jack Waters, Norfolk Southern's superintendent of terminals in Chattanooga. Norfolk Southern queried Mr. Waters about a visit to the deButts yard made by Jim Hall. Norfolk Southern asked Mr. Waters about a letter Mr. Hall sent to him following the visit. In the letter, Mr. Hall praised the company's clean-up efforts at the deButts yard. Hickson objected to the questions about Mr. Hall's letter, arguing Mr. Hall's praise of Norfolk Southern's clean-up efforts improperly implied a finding of the NTSB and that such findings are not admissible pursuant to 49 U.S.C. § 1154(b). Hickson contended Mr. Waters's testimony about the letter, if allowed, would necessarily open the door to its introduction of NTSB findings to rebut Mr. Hall's praise. Norfolk Southern responded that the letter, which it offered to show its cooperation with the NTSB, fell within a hearsay exception (Exh. B, Uncertified Realtime Transcript, Apr. 25, 2002, at 179; Exh. F, Uncertified Realtime Transcript, May 1, 2002, at 30). The Court overruled Hickson's objection but warned the letter "may also be character evidence" (Exh. B, at 180), such that the introduction of the letter might open the door to Hickson's limit-

---

1. Norfolk Southern filed a similar motion in the first trial (Court File No. 425).

ed use of the NTSB findings as rebuttal evidence (Exh. B, at 181). Despite the Court's warning, Norfolk Southern introduced the letter.[2]

On April 29, 2002, during its cross-examination of Henry Wyche, who at the time of the spill was Norfolk Southern's assistant vice president in charge of environmental protection, Hickson pursued a line of questioning designed to elicit testimony about Norfolk Southern's conviction of a felony in 1989 for the improper disposal of paint at a rail yard in Moberly, Missouri (Exh. C, Uncertified Realtime Transcript, Apr. 29, 2002, at 102). Norfolk Southern objected, arguing the evidence should be excluded pursuant to Rule 609 and/or Rule 403 of the Federal Rules of Evidence. Hickson contended the evidence should be allowed to impeach Norfolk Southern's testimony through its representatives and to rebut the character evidence developed through the testimony of Mr. Oliver and the letter of Mr. Hall.

Later on the same day, Hickson informed the Court it desired to rebut Mr. Waters's testimony about Mr. Hall's letter by introducing certain findings of the NTSB. Norfolk Southern objected, stating the Court would introduce error into the record should it admit the NTSB findings. Moreover, Norfolk Southern argued, if any portion of the NTSB report were admitted, then the entire report would need to be admitted.

The Court issued the following ruling from the bench:

Before we recessed for lunch, Hickson Corporation moved the Court to admit evidence of Defendant Norfolk Southern Railway's prior felony conviction. Hickson argues this evidence is admissible to counter evidence of Norfolk Southern's good character

Such evidence is impeachment and is governed by Federal Rule of Evidence 609. Evidence of a prior felony conviction is admissible under Rule 609 if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted.

Since we're dealing with a corporation here, the distinction between a felony conviction and a misdemeanor is the amount of the imposable fine. It is conceded that this conviction is a felony conviction. Hickson sought to use the evidence in its cross-examination of the present witness, a former officer and employee of Norfolk Southern. The conviction pertains to Norfolk Southern and not the witness. The Court notes Rule 609 only refers to the credibility of witnesses and not the credibility of corporations.

The Court has been unable to locate any case that has dealt with the applicability of Rule 609 to a corporation; however, the Court realizes a corporation can only act through the words and actions of its officers, agents, and employees. When such officers, agents, and employees testify on behalf of the corporation, in reality it is the corporation testifying. In such cases it would be reasonable to allow impeachment just as if the corporation was a person. Any other ruling would give the corporation an unreason-

---

**2.** At the time the letter was written, Mr. Hall was the head of the NTSB. This position was a presidential appointment that required the confirmation of the Senate. Mr. Hall is a lifelong resident of the Chattanooga area. He has been a prominent member of the community for a number of years and has been favorably considered for a number of political positions, both statewide and nationwide. He is widely known and respected in this community. It is reasonable to assume that many of the jurors would be familiar with Mr. Hall, at least by reputation.

able advantage under Rule 609 as compared to a natural person.

Alternatively, even if Rule 609 is determined not to apply to the circumstances of this case, the Court will still find the prior conviction relevant under Federal Rule of Evidence 401.

Norfolk Southern has already introduced evidence interjecting its good character into the trial. Specifically it has introduced evidence it has won a safety award for a period of several consecutive years and is the only railroad company in the country to have achieved this accomplishment. It has also introduced evidence that Jim Hall, the former head of the National Transportation Safety Board, praised Norfolk Southern for its cleanup efforts for the accident in this case. Thus, Norfolk Southern has made its good character for safety an issue subject to impeachment. Its felony conviction for an environmental violation speaks directly to the issue of its credibility regarding its good character for safety and its response to the spill involved here. Any prejudicial effect of this conviction does not substantially outweigh its probative value. Therefore, the Court will allow Hickson to use the prior conviction under Rule 403 of the Federal Rules of Evidence.

As the Court just indicated, Norfolk Southern introduced a letter written by Jim Hall, the former head of the National Transportation Safety Board. This letter praised Norfolk Southern for its cleanup efforts for the accident in this case. Plaintiff Hickson Corporation moved the Court to admit the specific findings of the National Transportation Safety Board in order to rebut this evidence.

Normally no portion of a report of the NTSB is admissible pursuant to statute, that is, 49 United States Code, Section 1903. The jury, having heard this evidence of Jim Hall's letter, would be entitled to infer from this letter that the NTSB found no fault with Norfolk Southern's efforts in cleaning up the spill. To the extent their findings of the NTSB contradict this inference, simple fairness dictates that Hickson should be allowed to do so. The Court therefore will admit the specific findings of the NTSB report for the limited purpose of rebutting Jim Hall's statements in his letter to Norfolk Southern.

(Exh. D, Uncertified Realtime Transcript, Apr. 29, 2002, at 116–19).

On April 30, 2002, Norfolk Southern renewed its objection to the admission of the Rule 609 evidence. After hearing further arguments, the Court adhered to its earlier decision (Exh. E, Uncertified Realtime Transcript, Apr. 30, 2002, at 13).

On May 1, 2002, during its cross-examination of Mr. Wyche, Hickson moved the admission of an excerpt of the NTSB findings. Norfolk Southern renewed its objections based on 49 U.S.C. § 1154(b), arguing all the conclusions of the NTSB should be admitted if any were. The Court responded by restating its previous decision:

As counsel for Norfolk Southern stated, there is a federal statute that prohibits the introduction into evidence of the NTSB report. However, Norfolk Southern in this case introduced a letter from Jim Hall, who at the time was the head of the NTSB, and this letter made reference to how Norfolk Southern had conducted itself with regard to the cleanup. The Court admitted that letter over objection from Hickson Corporation. In the interest of fairness, the Court believes that it is only appropriate to allow Hickson to introduce anything in the report itself that in any way contradicts the contents of the letter from Mr. Hall.

The Court believes that this limited exception is authorized by the case law construing that statute. But that would not open the door for the introduction of any other portion of the report. That was the decision of the Court previously. The Court reaffirms that decision, and the Court will issue a written memorandum and order elaborating on the rationale for its decision. So the findings, to the extent that they would allow inferences contrary to what was contained in Jim Hall's letter, are admitted.

(Exh. F, at 26–27).

## H. ANALYSIS

### A. Norfolk Southern's Prior Conviction

■ Under Rule 609 of the Federal Rules of Evidence,[3] a party may introduce evidence of a witness's prior felony conviction, subject to the requirements of Rule 403,[4] to attack the witness's credibility. The Court has not found case law applying Rule 609 to a corporation. This dearth of precedent is not surprising, of course, given that an inanimate corporation cannot itself be a witness. Because a corporation speaks through its officers, employees, and other agents, however, it stands to reason a corporation can be a vicarious witness. The Court concludes, therefore, Rule 609 allows the use of a corporation's felony conviction to impeach the corporation's vicarious testimony.

The Court notes one federal appellate court has held a corporation's conviction cannot be used to impeach an individual employee witness who had not participated in the criminal conduct at issue. *See Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 523–24 (3d Cir.1997). The situation in *Walden,* however, involved the use of a corporate conviction to impeach an employee—not the employee's employer. For this reason, the Court finds *Walden* inapropos.[5]

In this case, Hickson sought to introduce evidence of Norfolk Southern's felony conviction after Joe Oliver, an employee of Norfolk Southern, testified about the company's good environmental and safety record, and Jack Waters, an employee of Norfolk Southern, testified about a letter he received from Jim Hall praising the company's clean-up efforts at the deButts yard. Unlike the circumstances in *Walden,* Hickson's apparent intent was to impeach Norfolk Southern, not a particular witness. Indeed, Hickson sought to introduce the evidence through Henry Wyche, another Norfolk Southern employee. Hence, it cannot be said Hickson attempt-

---

**3.** Rule 609 provides:

For the purpose of attacking the credibility of a witness, (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused....

Fed.R.Evid. 609.

**4.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste or time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

**5.** Indeed, if the Court were to read *Walden* as broadly as Norfolk Southern suggests—that is, standing for the proposition Rule 609 never applies to corporations because they cannot be actual witnesses—the self-professed credibility of a corporation for a particular character trait could never be impeached with evidence of past felonious malfeasance.

ed to use the evidence to impeach either Messrs. Oliver or Waters.

When Mr. Oliver testified about Norfolk Southern's twelve-year run of awards for safety, and when Mr. Waters testified about Mr. Hall's praise of Norfolk Southern's clean-up efforts, they testified as representatives of Norfolk Southern. More to the point, their testimony placed Norfolk Southern's credibility at issue. Speaking through its agents, Norfolk Southern told the jury the company had a good environmental and safety record. The Court therefore concluded Hickson should be allowed to use the evidence of the prior felony conviction to impeach Norfolk Southern's vicarious testimony. Because the probative value of Norfolk Southern's felony conviction was not substantially outweighed by its prejudicial effect, the Court further concluded Rule 403 should not bar its admission.

## B. The NTSB Findings

No part of a report of the [NTSB], related to an accident or an investigation of an accident, may be admitted as evidence or used in a civil action for damages resulting from a matter mentioned in the report.

49 U.S.C. § 1154(b). Congress enacted this rule because "NTSB investigatory procedures are not designed to facilitate litigation." *Chiron Corp. & PerSeptive Biosys., Inc. v. NTSB*, 198 F.3d 935, 940 (D.C.Cir.1999). Section 1154(b) also serves to prevent the use of NTSB reports in a manner that would encroach on the province of a judge or jury. *See Lobel v. American Airlines*, 192 F.2d 217 (2d Cir. 1951). Although NTSB findings are inadmissible, the admission of factual data from NTSB investigations is not barred by § 1154(b), as the NTSB made clear in a regulation promulgated in 1975:

*Accident*, for purposes of this part includes "incident."

*Board accident report* means the report containing the Board's determinations, including the probable cause of an accident, issued either as a narrative report or in a computer format ("briefs" of accidents). Pursuant to section 701(e) of the Federal Aviation Act of 1958 (FA Act), and section 304(c) of the Independent Safety Board Act of 1974 (49 U.S.C. 1154(b)) (Safety Act), no part of a Board accident report may be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such reports.

*Factual accident report* means the report containing the results of the investigator's investigation of the accident. The Board does not object to, and there is no statutory bar to, admission in litigation of factual accident reports. In the case of a major investigation, group chairman factual reports are factual accident reports

49 C.F.R. § 835.2 (2001); *see also Chiron Corp.*, 198 F.3d at 940 (explaining earlier courts unnecessarily labeled the admission of such factual findings an exception to § 1154(b), erroneously confusing investigators' findings with findings of the NTSB).

■ Had the Court considered only the plain language of § 1154(b), it would not have admitted any portion of the NTSB report into evidence. However, the circumstances created by Norfolk Southern required the Court to admit otherwise inadmissible evidence to cure the prejudicial inference that arose when Norfolk Southern introduced Mr. Hall's letter over Hickson's objection and despite the Court's warning about the consequences. Because a reasonable juror would infer from Mr. Hall's letter the NTSB found Norfolk Southern's clean-up efforts not just adequate but laudable, the Court determined

it needed to allow a limited portion of the NTSB report to counter the inference. The Court's decision was guided, in no small part, by Mr. Hall's special status in the Chattanooga area as a local boy made good. Given this status, the Court concluded the jury would reasonably equate Mr. Hall's praise of Norfolk Southern with the NTSB's official approval of Norfolk Southern's conduct in cleaning up the leak. In short, the Court determined it needed to admit certain NTSB findings to remove the prejudice injected by Norfolk Southern's use of Mr. Hall's letter.[6] *See* 21 Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure* § 5039, at 204–05 (1977).

In any event, to the extent the Court's decision constituted error, it appears to be error invited by Norfolk Southern's own actions and insistence on introducing Mr. Hall's letter:

> Under the "invited error" doctrine, it is an accepted matter of law that where the injection of allegedly inadmissible evidence is attributable to the action of the party seeking to exclude that evi-

dence, its introduction does not constitute reversible error.

*All American Life & Cas. Co. v. Oceanic Trade Alliance Counsel Int'l Inc.*, 756 F.2d 474, 479–80 (6th Cir.1985); *see also Fields v. Bagley*, 275 F.3d 478, 485–86 (6th Cir. 2001); *Harvis v. Roadway Exp., Inc.*, 923 F.2d 59, 60–61 (6th Cir.1991); 21 Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure* § 5039, at 204 & n. 18.1 (1977 & 2002 Supp.). The Court determined Norfolk Southern provoked the admission of portions of the NTSB report. Because Norfolk Southern fostered the inference of the NTSB's approval of its clean-up efforts, the Court did not find its objection to evidence of the NTSB's disapproval of those efforts well-taken.[7]

## III. CONCLUSION

For the foregoing reasons, the Court has admitted both evidence of Norfolk Southern's prior felony conviction and a portion of the NTSB report on the leak at the deButts yard.

**SO ORDERED.**

---

**6.** Under the law of the United States Court of Appeals for the Sixth Circuit, the rule of completeness does not justify the admission of the NTSB report. Rule 106 of the Federal Rules of Evidence provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed.R.Evid. 106. There is a split of opinion among the federal appellate courts as to whether Rule 106 merely regulates the order of proof or makes admissible that which otherwise would not be. The Sixth Circuit falls within the former camp. *See United States v. Costner*, 684 F.2d 370, 373 (6th Cir.1982) ("The rule covers an order of proof problem;

it is not designed to make something admissible that should be excluded."); *see also Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 532 (6th Cir.1989) (stating Rule 106 does not allow the use of otherwise inadmissible evidence for completeness "just because part of a document may be utilizable for impeachment ·purposes"). *But see* 21 Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure* § 5078 (1977 & 2002 Supp.) (arguing the "order of proof" analysis adopted by the Sixth Circuit (among others) is erroneous).

**7.** The Court understands the doctrine of invited error is a "cardinal rule of appellate review." *See Harvis*, 923 F.2d at 60. Hence, it did not rest its decision to admit a portion of the NTSB report on that doctrine.

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HICKSON CORPORATION,

    Plaintiff and Counter-Defendant,

-versus-                 1:95-CV-266

NORFOLK SOUTHERN RAILWAY COMPANY,

    Defendant, Counterclaimant, and
    Third-Party Plaintiff,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                 Chattanooga, Tennessee
                 April 22, 2002

EXHIBIT A

least likelihood for any contact with the cars because their work is to work on the track or the bridges, but they also receive some training to teach them what to do in the event they might be exposed to any products or anything.

Q          Now, when an employee comes up on a hazardous materials problem, what's he supposed to do?

A          The employee is immediately supposed to notify his supervisor. That's been the standard protocol for the railway company ever since I've been there--notify your supervisor. And if you are the supervisor, then you will notify the division chief dispatcher.

Q          And if something's leaking, what are you supposed to do, if you can, as far as the amount of the leak?

A          Well, you're supposed to determine what the material is first, find out what we're dealing with, No. 1; No. 2, if it's safe to do so, take some measures to try to contain the material, keep it from being released any further than it already is. If it's, say, an oil leak from a locomotive tank, and it's feasible to take and drive a plug up in the hole in the tank or something, then, you know, we try to get our employees to do that, if it's safe for them to do so.

          Norfolk Southern--and I'm proud to say this--we have won the gold medal for safety for 12 consecutive years. Our railway is the safest railway industry in the nation.

Q          What's that award called?

A          It's called the E. H. Harriman award.  The Harriman award is presented to the different classes of railroads.  And there's basically three classes.  You've got your big Class 1 carriers, you've got your small senior medium-sized railroads, and then you've got your short lines.  For Class 1 railroads we have won the gold medal for 12 consecutive years.  And that, to me, says everything about your safety program.

Prior to us getting on this run of winning this award so many years in a row, I think the most that anybody had ever won it was maybe two or three times in a row.  So we're on a roll.  And we're very, very proud of our safety record.  We have set a new benchmark in the industry, and we're very proud of it.  It's been difficult to achieve, but we have worked to make sure our employees are safe.

Q          You keep talking about they're supposed to look at this hazardous materials problem and take certain actions if it is safe for them to do so.  Give us some examples of some things that are safe to do and maybe some things that are unsafe to do and how you have trained employees to know the difference.

A          If the material -- if the product is something that is fairly innocuous, say it's a nonhazardous material such as kaolin clay, then it's pretty easy for somebody to get out there and put a container underneath it to try to capture it before it's released.

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HICKSON CORPORATION,                    :
                                        :
   Plaintiff and Counter-Defendant, :
                                        :
-versus-                                :    1:95-CV-266
                                        :
NORFOLK SOUTHERN RAILWAY COMPANY,       :
                                        :
   Defendant, Counterclaimant, and  :
   Third-Party Plaintiff,           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                         Chattanooga, Tennessee
                         April 25, 2002

EXHIBIT B

A          No, sir, they did not.

BY MR. ALLEN:

Q          "Who is Mr. Jim Hall?

A          "Jim Hall -- I think his title is director of the National Transportation Safety Board.

Q          "And did Mr. Hall send representatives down to the yard to investigate and look at the spill and what caused it?

A          "Mr. Hall himself came down, along with representatives.  And they left those representatives here for some time.  I forget how long they were here investigating this incident.

Q          "And following that investigation --"

MR. O'DAY:  Your Honor?  Your Honor?  Excuse me.  We have an objection.

MR. ALLEN:  I'm in the middle of a question, Your Honor.

MR. O'DAY:  Well, I'm going to object to the question in the deposition.

MR. ALLEN:  Your Honor, I would at least like to finish the question, instead of --

MR. O'DAY:  I think that's the purpose of lodging objections prior to testimony, Your Honor.

What line was that?  I didn't mark it.

MR. ALLEN:  First of all, you didn't note it as an objection in your response that you were supposed to file.  So

tell me what line you're objecting to.

MR. O'DAY: The question you just started.

Beginning with Line 10, Your Honor, it's a question regarding a finding -- well, it implies a finding of the National Transportation Safety Board. And I think both parties have agreed that National Transportation Safety Board findings are not admissible. I think both parties have actually agreed to that before this started. So --

MR. ALLEN: Your Honor, if I might respond. It does not imply a finding of the National Transportation Safety Board. This was early on. Mr. O'Day points that out later on in the cross-examination. Point No. 1, this was admitted in the first trial, without objection by Mr. O'Day. Number 2, it very clearly fits within the same exception, hearsay exception, 803(8), that Your Honor let in that other document that included some other statements that were clearly hearsay. It's the same type -- exact same scenario. It's a hearsay letter, but it's reliable.

The whole purpose of the hearsay exception is to keep out unreliable evidence. And if you're going to let it in for, you know, a similar type document, there-- This is not the -- any finding of the National Transportation Safety Board. Mr. O'Day goes to great lengths to talk about commissioners's orders and everything. And we've got a letter here that should be admitted, as it was in the last trial,

Your Honor.

MR. O'DAY: Your Honor, there was a finding of the National Transportation Safety Board, an official finding. And we would be happy to offer that finding in rebuttal of this question and answer.

MR. ALLEN: Your Honor, that is totally inappropriate. You have previously ruled that that is not appropriate. And for Mr. O'Day to say that out in open court is another flagrant attempt to influence the jury. And, frankly, you know, it's improper.

THE COURT: The Court is going to overrule the objection. The Court does note that this-- I have not seen the letter itself. So obviously I don't know what it says. But this may also be character evidence. But the Court is going to allow it.

MR. ALLEN: Back to Line 10.

BY MR. ALLEN:

Q        "And following that investigation, did Mr. Hall mail a personal letter to you stating -- or congratulating you on your efforts?

A        "Yes, sir.

Q        "And is that letter a part of the permanent records of the railroad?

A        "Yes, sir.

Q        "To whom--"

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HICKSON CORPORATION,               :

   Plaintiff and Counter-Defendant, :

-versus-                           :        1:95-CV-266

NORFOLK SOUTHERN RAILWAY COMPANY,  :

   Defendant, Counterclaimant, and :
   Third-Party Plaintiff,          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                    Chattanooga, Tennessee
                    April 29, 2002

EXHIBIT C

A        Correct.

Q        And he was director of hazardous materials?

A        I don't remember exactly what his title was.  He was responsible--  I spoke to Mr. Foster for HAZMAT matters and industrial hygiene.

Q        Were you head of the environmental protection department in 1989 when employees at the Moberly railyard in Missouri --

        MR. FOSTER:  Objection, Your Honor.  I would like to request that we have a jury-out hearing before we go down this line.  I think there are some serious questions here, and I prefer not to address them in front of the jury.

        THE COURT:  Ladies and gentlemen, let me have you take your lunch break now.  It's about ten minutes until noon.  Why don't you plan on coming back at 1:30?

                (The jury left the courtroom, and the proceedings
                continued as follows:)

        THE COURT:  Be seated.

        MR. FOSTER:  Your Honor, Moberly, Missouri, is an incident separate and apart from this matter.  It has absolutely nothing to do with the arsenic acid spill.  And Mr. Poff is our resident expert on convictions and matters, and, with your concurrence, I'll let him speak more to the law side of it.  But this is a conviction over an unrelated environmental matter, involves a guilty plea, and I don't

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

HICKSON CORPORATION,

    Plaintiff and Counter-Defendant,

-versus-                          1:95-CV-266

NORFOLK SOUTHERN RAILWAY COMPANY,

    Defendant, Counterclaimant, and
    Third-Party Plaintiff,

Chattanooga, Tennessee
April 29, 2002

EXHIBIT D

measure of introducing the full report.

THE COURT: And that would take care of the issue concerning the findings being taken out of context.

MR. FOSTER: No, Your Honor, it just compounds the error. But if you're going to get slugged with error, you fight it with everything you got. And I think you need to go back and look at the prohibition against introducing the findings. It's only, as I read it, to be brief, the factual findings of the individual witnesses that are properly in. The statute prohibits the introduction of the findings. But if you're going to compound the error, we certainly want to put them in context and have the right to discuss the entire batch.

THE COURT: Okay. The Court will take this under advisement, also.

Anything else?

MR. O'DAY: That's it for now, Your Honor.

THE COURT: We'll be in recess until -- what did I say, 1:30? 1:30.

(Noon recess.)

THE COURT: Please be seated.

Before we recessed for lunch, Hickson Corporation moved the Court to admit evidence of Defendant Norfolk Southern Railway's prior felony conviction. Hickson argues this evidence is admissible to counter evidence of Norfolk

Southern's good character.

Such evidence is impeachment and is governed by Federal Rule of Evidence 609. Evidence of a prior felony conviction is admissible under Rule 609 if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted.

Since we're dealing with a corporation here, the distinction between a felony conviction and a misdemeanor is the amount of the imposable fine. It is conceded that this conviction is a felony conviction. Hickson sought to use the evidence in its cross-examination of the present witness, a former officer and employee of Norfolk Southern. The conviction pertains to Norfolk Southern and not the witness. The Court notes Rule 609 only refers to the credibility of witnesses and not the credibility of corporations.

The Court has been unable to locate any case that has dealt with the applicability of Rule 609 to a corporation; however, the Court realizes a corporation can only act through the words and actions of its officers, agents, and employees. When such officers, agents, and employees testify on behalf of the corporation, in reality it is the corporation testifying. In such cases it would be reasonable to allow impeachment just as if the corporation was a person. Any other ruling would give the corporation an unreasonable advantage under Rule 609 as compared to a natural person.

Alternatively, even if Rule 609 is determined not to apply to the circumstances of this case, the Court will still find the prior conviction relevant under Federal Rule of Evidence 401.

Norfolk Southern has already introduced evidence interjecting its good character into the trial. Specifically it has introduced evidence it has won a safety award for a period of several consecutive years and is the only railroad company in the country to have achieved this accomplishment. It has also introduced evidence that Jim Hall, the former head of the National Transportation Safety Board, praised Norfolk Southern for its cleanup efforts for the accident in this case. Thus, Norfolk Southern has made its good character for safety an issue subject to impeachment. Its felony conviction for an environmental violation speaks directly to the issue of its credibility regarding its good character for safety and its response to the spill involved here. Any prejudicial effect of this conviction does not substantially outweigh its probative value. Therefore the Court will allow Hickson to use the prior felony conviction under Rule 403 of the Federal Rules of Evidence.

As the Court just indicated, Norfolk Southern introduced a letter written by Jim Hall, the former head of the National Transportation Safety Board. This letter praised Norfolk Southern for its cleanup efforts for the accident in

this case. Plaintiff Hickson Corporation moved the Court to admit the specific factual findings of the National Transportation Safety Board in order to rebut this evidence.

Normally no portion of a report of the NTSB is admissible pursuant to statute, that is, 49 United States Code, Section 1903. The jury, having heard this evidence of Jim Hall's letter, would be entitled to infer from this letter that the NTSB found no fault with Norfolk Southern's efforts in cleaning up the spill. To the extent their findings of the NTSB contradict this inference, simple fairness dictates that Hickson should be allowed to do so. The Court therefore will admit the specific findings of the NTSB report for the limited purpose of rebutting Jim Hall's statements in his letter to Norfolk Southern.

The last issue was the containment facility. The Court has already ruled that general evidence of the containment facility and internal discussions within Norfolk Southern are not admissible in this case. The Court, however, has allowed the parties to explore with witnesses the fact that a containment facility was not available at the time of the spill and also the witnesses' belief as to whether a containment facility would or would not have reduced the damages incurred in this case. The Court does not recall this witness saying anything that would cause the Court to change its decision with regard to that earlier decision. So that

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HICKSON CORPORATION, :
                    :
    Plaintiff and Counter-Defendant, :
                    :
-versus-            :     1:95-CV-266
                    :
NORFOLK SOUTHERN RAILWAY COMPANY, :
                    :
    Defendant, Counterclaimant, and :
    Third-Party Plaintiff, :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Chattanooga, Tennessee
April 30, 2002

EXHIBIT E

did report on the details of the settlement, as I asked him yesterday, and to confirm that.

With respect to Kearney, I asked him about the staffing recommendations and what was decided. He could not recall. That's exactly what's in those minutes.

And then with respect to the report on spill incidents, I think both Your Honor and Mr. Poff have recognized that that discussion has already occurred with respect to prior spill incidents. This just has additional details about those, not many, that I wanted to go through with Mr. Wyche, that he couldn't recall yesterday.

MR. POFF: Your Honor, not to belabor the point, but, on the Moberly incident, what Mr. O'Day says undercores our objection that Federal Rules of Evidence, as I understand it, contemplate, at most, and we think here not at all, the admission of a conviction, not whether the conviction resulted in a thousand-dollar fine or 10 million-dollar fine. And to underscore the nature of the crime, the details of the crime, or that sort of thing, are simply not contemplated by the rules and is unduly prejudicial for the reasons that I have already stated. And so we would respectfully object to any admissibility of the minutes relating to Moberly for that additional reason.

THE COURT: Okay. Thank you. I appreciate the arguments of counsel.

The Court has reconsidered the matter in light of the actual exhibits here and also the case that Mr. Poff was so kind to afford the Court. The Court will adhere to its earlier decision with respect to the conviction.

Having examined the minutes here, the Court finds that they are relevant to the subject matter that was brought up yesterday during the examination of -- the cross-examination of Mr. Wyche. So the Court will allow Mr. O'Day to use them.

Are we ready for the jury?

MR. O'DAY: One more item, Your Honor. This is anticipated with the next witness. Norfolk Southern will begin calling its expert witnesses, I understand, immediately after Mr. Wyche. They have four exerts lined up, three of whom cover overlapping topics. They're all going to talk about the appropriateness of Norfolk Southern's response. They're all going to talk about the appropriateness of Norfolk Southern's preparedness. And we object to the unduly cumulative nature of that testimony.

THE COURT: Well, let's take that up before they come in. The Court has a twice-a-year Criminal Justice Act meeting at 10:00 that the Court was going to try to just spend 30 minutes on and have the magistrate preside over the remainder of the meeting. But I will have to step down at 10:00, and we will have to have at least a 30-minute recess.

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

- - - - - - - - - - - - - - - - - - - - - - - - - -
                                    :
HICKSON CORPORATION,                :
                                    :
    Plaintiff and Counter-Defendant, :
                                    :
-versus-                            :        1:95-CV-266
                                    :
NORFOLK SOUTHERN RAILWAY COMPANY,   :
                                    :
    Defendant, Counterclaimant, and :
    Third-Party Plaintiff,          :
- - - - - - - - - - - - - - - - - - - - - - - - - -

Chattanooga, Tennessee
May 1, 2002

EXHIBIT F

928

Norfolk Southern's lawyers that very question about admitting all of the findings--Your Honor had approved admitting only certain of the findings--and they had insisted that the whole report come in. And I had suggested to them that we just admit all the findings and not the whole report, because we didn't need the hundred-something pages of the report. This is the first time I've heard that they agreed with that. The exhibit that I tendered was the one that you had approved in our previous discussion on the topic. I, however, will tender a substitute 1058C, based on that agreement, that contains all of the conclusions of the NTSB.

MR. FOSTER: Provided that preserves our objection in toto, Your Honor. You know, we spent an hour outside the presence of the jury, and we just want to make it clear that we object.

THE COURT: Since there is still an objection, then, I think it is necessary for the Court to restate its conclusion. As counsel for Norfolk Southern stated, there is a federal statute that prohibits the introduction into evidence of the NTSB report. However, Norfolk Southern in this case introduced a letter from Jim Hall, who at the time was the head of the NTSB, and this letter made reference to how Norfolk Southern conducted itself with regard to the cleanup. The Court admitted that letter over objection from Hickson Corporation. In the interest of fairness, the Court

REALTIME - UNCERTIFIED ROUGH DRAFT

believes that it is only appropriate to allow Hickson to introduce anything in the report itself that in any way contradicts the contents of the letter from Mr. Hall. The Court believes that this limited exception is authorized by the case law construing that statute. But that would not open the door for the introduction of any other portion of the report. That was the decision the Court made previously. The Court reaffirms that decision, and the Court will issue a written memorandum and order elaborating on the rationale for its decision. So the findings, to the extent that they would allow inference contrary to what was contained in Jim Hall's letter, are admitted.

MR. O'DAY: And in strict compliance with that order and its limitations, Judge, we have put together Exhibit 1058C, the original one that I tendered, which constitutes the cover page and Page 62 and 63, beginning with Finding 7 and all the way through the probable cause finding. And we tender that. That's the exhibit we're tendering.

THE COURT: The Court notes there is an objection.

MR. FOSTER: Yes. Your Honor, if we're going to do it, we ought to take the exhibit and get it with all findings at one time, rather than splitting them in two. That's what we just said. If we're going to get stuck with the findings, in violation of the statute, we think they should come in, not as he redacted them, but just the two pages of the findings.

Emergency response activities had been conducted between the city and Norfolk Southern. That doesn't speak to anything in that letter.

The probable cause determination has nothing to do with this particular letter. Therefore I see nothing in 1058C that would come within the definition of what you have just told us as far as Mr. Hall's letter is concerned.

THE COURT: Mr. Foster, what was the purpose of Norfolk Southern introducing Mr. Hall's letter?

MR. FOSTER: Just to show that we cooperated and to show that we moved along with the NTSB.

THE COURT: Was that an issue in the case?

MR. FOSTER: I think, Your Honor, it's a part of showing the properness of our overall emergency response. And one of the things that you do in an appropriate emergency response is follow the incident commander, cooperate with local authorities, and cooperate with other environmental authorities, including the NTSB. That's part of the appropriateness of the response, and it falls in line--1, 2, 3--with the issues in terms of how we handled the response.

THE COURT: Now, what do you think would be a logical inference that a reasonable juror would draw from reading that letter?

MR. FOSTER: That we cooperated with the NTSB and it was another of the many regulators they followed and we did